SILBERMAN, Senior Circuit Judge,
concurring in the judgment and dissenting:
This case is a hot potato. It is a straightforward dispute over the proper interpretation of a criminal statute, section 302 of the Labor Management Relations Act, 29 U.S.C. § 186, and the relationship between that statute and section 8 of the National Labor Relations Act, id. § 156. The question is: Does the criminal statute mean employees have a legal right to revoke dues checkoff authorizations after the termination of an “applicable collective bargaining agreement”? Or can a union frustrate that right by providing only a “window period” for revocation before termination? The majority opinion avoids answering the question — presented by all parties' — by purporting to discover an ambiguity in the Board’s opinion that none of the parties perceived, and I do not believe exists, thereby justifying a remand.
To be sure, there is an ambiguity in the case, i.e., the dues checkoff authorization cards signed by grocery store clerks are ambiguous:
This authorization and assignment is voluntarily made in consideration for the cost of representation and collective bargaining and is not contingent upon my present or future membership in the Union. This authorization and assignment shall be irrevocable for a period of one (1) year from the date of execution or until the termination date of the agreement between the Employer and Local 99, whichever occurs sooner, and from year to year thereafter, unless not less than thirty (30) days and not more than forty-five (45) days prior to the end of any subsequent yearly period I give the Employer and Union written notice of revocation bearing my signature thereto.
Smith’s Food & Drug Ctrs. Inc., 358 NLRB 704, 706 (2012).
It is not clear from the text of the authorization whether the subsequent year-to-year period of irrevocability runs from the date of the expiration of the first year or the termination date of the contract, and also whether the window period — during which an employee can revoke' — precedes the anniversary date or the expiration of the agreement, or both.
Indeed, the General Counsel claimed that the checkoff forms were ambiguous, but the ALJ rejected that claim. The ALJ said the authorizations were “sufficiently clear” to allow each employee who signed an authorization during the 2003-2008 contract the opportunity to revoke that authorization during the window periods preceding his or her anniversary date. Id. at 708. He then wrote a sentence while examining the authorization cards upon which the majority rests its entire opinion: “In addition, employees who signed authorizations during the last year of the contract could revoke their authorizations upon the expiration of th[e] contract.” Id. The majority concludes that because in that sentence the ALJ neglected to mention a window period before the termination of the contract, he implicitly found there was no additional window period before the contract terminated — and therefore the main issue presented by the parties is not really before us. If there was no window period before the termination of the contract, under Board doctrine, employees would clearly have a right to revoke their author *33 ization at will during the hiatus, after termination of the contract.
There is a very good reason why none of the three parties before us discovered this anomaly in the Board’s decision — it does not exist. At trial, the union representative confirmed there was “a window period 30 to 45 days prior to the anniversary date of signing it and prior to the expiration of the contract.” (emphasis added). The ALJ endorsed this understanding of the pre-termination window periods later in his opinion, making absolutely clear that there was — as a matter of practice — a window period before the expiration of the contract. He said, “And at the trial while discussing with me the window period pri- or to the expiration of the contract, the General Counsel conceded: ‘Well, I think both parties agree that during the 15 day period before October of 2008 that the parties could revoke.’ ” Id. at 709 (emphasis added). In other words, although the authorization cards could be read as omitting a window period prior to expiration of the contract, as the ALJ had earlier noted, the parties actually interpreted the authorization as providing a window period of 15 days before termination of the contract, and therefore the ALJ recognized the pre-termination window period existed. No party challenged that factual proposition. Indeed, the Board’s brief states that the Board “has had no occasion to pass on whether a revocation period at [before] the expiration of a bargaining agreement can be limited to those who sign authorizations during the last year of a bargaining agreement.” Yet that is exactly the issue the majority believes this case presents. But that is not the Board’s view. In sum, the very premise of the majority opinion is — I am almost reluctant to say — absolutely false. It is entirely made up.
If the majority were correct and somehow all the parties to this case misunderstood the ALJ’s opinion — i.e., employees who signed authorization cards before the last year were entitled to revoke at termination because there was no window period for them — then there would be no possible reason why the ALJ would not have granted employees in that category relief under longstanding Board doctrine. See Atlanta Printing Specialties, 215 NLRB 237 (1974), enf'd, 523 F.2d 783 (5th Cir. 1975). It has never been asserted by anyone, the parties to this case, the Board, nor any court, that under section 302 employees can be denied an opportunity to revoke authorization cards after termination of an applicable collective bargaining agreement if there is no pre-termi-nation window period. In other words, the only ground that can be advanced — and I think it is a gimmick — to deprive an employee of a right to revoke after termination is a window period. See Frito-Lay, Inc., 243 NLRB 137 (1979). In an effort to find an ambiguity in the ALJ’s opinion — a pearl in the oyster — the majority attributes to the ALJ an absurd position. It is not a pearl the majority has found; it is a piece of sand.
The ALJ (and the Board [1]), without the majority’s creative assistance, understood it was required to face the question whether under section 302 employees had an absolute right to withdraw their authorization after termination of the contract, during the hiatus period before a new contract was signed. See 29 U.S.C. § 186(c)(4). (All parties agree that the series of interim agreements have no legal significance.) To *34 that question, the ALJ had an easy answer. The Board decided that question years ago in Frito-Lay. Smith’s Food & Drug Ctrs., 358 NLRB at 707 (citing Frito-Lay, 243 NLRB at 144). The Board had held that so long as a union’s authorization cards provided a window period before the expiration of a collective bargaining agreement, employees did not have an additional right to revoke their authorization at the termination of the agreement. See Frito-Lay, 243 NLRB at 138.
The Board in Frito-Lay — as it does before us — read the crucial language in section 302 giving an employee a right to revoke a checkoff authorization “beyond the termination of the applicable collective bargaining agreement” as satisfied by giving employees a window period before 'the termination of an applicable agreement. See id. The difference between a right to revoke during a limited pre-termination window and a right to revoke at will upon termination of an agreement is not an insignificant difference. Employees might well decide to revoke their authorizations, as in this ease, only after termination of an applicable agreement, because of the then-existing unsatisfactory status of relations between the union and employer.
The Board has a rather peculiar position regarding the legal effect of section 302(c)(4) on its application of the National Labor Relations Act. It recognizes that illegal checkoffs — i.e., payments to the union without employee authorization — would violate section 8 of the Act. See, e.g., id. at 137. But in deciding whether a checkoff authorization with a window period before termination of a contract satisfies section 302(c)(4), it does not consider itself actually bound by section 302 — though even the Board does not claim it may ignore section 302 completely. See id. at 138 (quoting Salant & Salant, Inc., 88 NLRB 816, 817-18 (1950)).
I think that it is an untenable position. Section 302 clearly represents Congressional policy on the legality of checkoff authorizations, even though it is expressed in a companion criminal statute. In an analogous case, the Supreme Court rejected an interpretation of the Sherman Act in a criminal proceeding because it was in tension with a later civil statute, the Norris-LaGuardia Act. See United States v. Hutcheson, 312 U.S. 219, 231-35, 61 S.Ct. 463, 85 L.Ed. 788 (1941). The Court reasoned that Congress had expressed its policy view as to the legality of a union’s conduct in the Norris-LaGuardia Act. Here too, the interplay between the criminal and civil provisions of related statutes means there must be a consistent understanding as to which checkoff practices are lawful and which are not, or else employers are exposed to conflicting obligations. The Board’s interpretation of section 8 of the NLRA cannot be in direct opposition to section 302’s criminal prohibition. See BASF Wyandotte Corp., 274 NLRB 978, 979 (1985), enf'd, 798 F.2d 849 (5th Cir. 1986).
Even assuming that section 302 does affect the proper interpretation of the NLRA, the Board argues that it is entitled to deference when it “looks” at section 302 and determines how it fits into that statute. Of course, it is axiomatic that the Board does get deference when it interprets ambiguous language in the NLRA under Chevron. See, e.g., Lechmere, Inc. v. NLRB, 502 U.S. 527, 536, 112 S.Ct. 841, 117 L.Ed.2d 79 (1992). That deference flows from Congress’s delegation to the Board to enforce that Act. But it is also a fundamental principle of administrative law that an agency does not get deference interpreting a statute if another body has responsibility to interpret the same language. See Collins v. Nat'l Transp. Safety Bd., 351 F.3d 1246, 1253 (D.C. Cir. 2003); *35 Wachtel v. Office of Thrift Supervision, 982 F.2d 581, 585 (D.C. Cir. 1998). That is particularly true if the other body is a federal court. Cf. Litton Fin. Printing v. NLRB, 501 U.S. 190, 202-03, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991) (citing Local Union 1395, Int’l Bhd. of Elec. Workers v. NLRB, 797 F.2d 1027, 1030-31 (D.C. Cir. 1986)).
Moreover, there is yet another reason for withholding deference in this case. After all, section 302 creates criminal liability. See NLRB v. Oklahoma Fixture Co., 332 F.3d 1284, 1291 (10th Cir. 2003) (Briscoe, J., concurring). See generally Esquivel-Quintana v. Lynch, 810 F.3d 1019, 1027 (6th Cir. 2016) (Sutton, J., concurring in part and dissenting in part), cert. granted, — U.S. -, 137 S.Ct. 368, 196 L.Ed.2d 283 (2016). To be sure, the Justice Department has not so far prosecuted an employer or union for refusing to permit an employee to revoke an authorization at the termination of an “applicable contract” if the contract contained a window period, but that is a matter of prosecutorial discretion and certainly does not bind an existing or future Justice Department.
That brings me to the merits of the statutory interpretation question, and I do not regard it as difficult. The Board adopts an anti-textual interpretation of the phrase, “beyond the termination.” It essentially claims that “beyond” can mean “before”; if an employee’s authorization card conferred a window period in which to revoke authorization before the termination date and he or she does not revoke, he or she has forfeited the right after termination of the contract. In this case, that means petitioners who sought to revoke their authorization during the hiatus period after termination of the applicable agreement in October 2008 were not entitled to revoke, and therefore Fry’s and Local 99 did not commit an unfair labor practice by refusing to accept revocations submitted during that period. I think the Board’s interpretation of section 302 is flatly wrong, as have other courts that have considered the issue.[2] The Board has engaged in a blatant attempt to rewrite a statute in which Congress spoke plainly— at least on the crucial issue.

. The Board adopted the ALJ’s dismissal of the complaint. It implicitly recognized that the authorization cards were ambiguous by noting that "the Acting General Counsel does not contest the facial validity of the Respondent Union's standard dues-checkoff authorization agreement." Smith’s Food & Drug Ctrs., 358 NLRB at 704 n.2.

. See Anheuser-Busch, Inc. v. Int’l Bhd. of Teamsters, 584 F.2d 41, 43 (4th Cir. 1978); Murtha v. Pet Dairy Products Co., 44 Tenn.App. 460, 314 S.W.2d 185, 190 (1957). Associated Press v. NLRB, 492 F.2d 662 (D.C. Cir. 1974), is not to the contrary. In that case, we did not interpret section 302(c)(4) but simply affirmed the Board’s deferral to an arbitrator. Id. at 667.